UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-14409-CIV-MAYNARD

ELIZABETH P. SEDLOCK,

    Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner,
Social Security Administration,

    Defendant.

_____/

FILED by _____ D.C.

SEP 1 4 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

## ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 12)

**THIS CAUSE** comes before this Court upon the above Motion.
Having reviewed the Motion, Response, and the Administrative
Record, and having held a hearing thereon on September 6, 2018,
this Court finds as follows:

### BACKGROUND

1. The Plaintiff applied for Title II disability
insurance benefits under the Social Security Act in April 2013.
The application was denied initially and after reconsideration.
On October 28, 2016, following two hearings, an Administrative
Law Judge ("ALJ") rendered a decision finding the Plaintiff not
disabled under the terms of the Act. The Appeals Council denied
her Request for Review on September 27, 2017, thereby leaving
the ALJ's decision final and subject to judicial review.

2.     The Plaintiff has a Master's degree in early special education. Around the time she stopped working she had nearly completed a second Master's degree, but for the same reasons why she was unable to continue working, she says she was unable to complete her studies. She has a long work history as a teacher in that field for the West Virginia public schools. She described her job---teaching physically disabled children at the pre-Kindergarten level---as an inherently physically-demanding job. At some point she was promoted to a specialist, administrative-level job which also was physically demanding but to a lesser degree. Towards the end of her employment she had the added help of an aide who lessened the job's physical demands on her. However the administrative-level job brought with it added stress and pressure.

3.     The medical record begins in April 2010 with a treatment note from her general practitioner, Dr. Hultman, DO. She was 51 years old at the time. That treatment note shows pre-existing prescriptions for pain medications (Lortab, Relafen, and Ultram) and for the psychogenic medication, Zoloft. The Plaintiff went to Dr. Hultman on a regular basis and for a wide range of ailments. These included tenderness and spasm in her back, diffuse aches and pains, depression, anxiety, post-menopause complaints, gastrointestinal-type symptoms, and

malaise-type complaints. None of the various ailments were particularly severe, and they waxed and waned over the months. Some of the complaints stemmed from her caregiving duties for her mother.

4.    The Plaintiff now was taking much sick leave, and Dr. Hultman's treatment notes beginning May 2011 show a new source of stress as her absenteeism caused a strain in the workplace. That prompted Dr. Hultman to write the first work release of record, on May 31st. Dr. Hultman's treatment notes show work-related stress to be a main issue through September 15, 2011 (which is her claimed disability onset date and her claimed last day of work). This is consistent with the Plaintiff's explanation at the hearing that emotional stress was her primary difficulty staying at work.[1] Dr. Hultman's treatment notes from 2011 show a variety of other complaints as well from poor sleep to back discomfort to hand numbness.

5.    She continued to complain of depression and anxiety over the next several months from both work and caregiving matters, and Dr. Hultman maintained her off-duty work release status. She declined a referral to mental health counseling, but through early 2012 her depression, anxiety, and stress-level

---

[1] The ALJ emphasized this point in her Decision, who found that Dr. Hultman had given her work excuses "based on her subjective account of stress at work, rather than as a result of any medical condition that would reasonably be expected to preclude work."

slowly improved. In February 2012 she bought a house in Florida, and on April 26, 2012 the Plaintiff moved here[2]. Dr. Hultman's preceding treatment notes from April 2012 show a wide variety of prescription medication. They include psychotropics, a variety of pain medications, Amitiza to ease opioid-related constipation, and sleep medication. For many months leading up to this point, Dr. Hultman had stressed the need for diet, exercise, and weight loss as a means to improve her overall health. Dr. Hultman expressed the hope that Florida's warmer weather would reduce joint discomfort and increase exercise and in turn allow her to reduce her medications. This Court notes that Dr. Hultman's physical examination observations were usually unremarkable.

6.    The Plaintiff resumed her medical care in Florida in July 2012 at the West Volusia Family and Sports Medicine practice. She complained of shortness of breath, hand numbness, depression, and anxiety. As with Dr. Hultman, the Plaintiff again declined formal mental health treatment, explaining that medication is effective at managing it. Various tests were overall unremarkable. The exception was the first high blood sugar diagnosis. The attending medical staff recommended diet,

---

[2] The ALJ emphasized how the Plaintiff had moved to Florida even while Dr. Hultman still had her on work-release status. The ALJ inferred therefrom the Plaintiff's lack of "intention of returning to work even if her symptoms improved with treatment."

weight loss, and exercise. Her prescriptions were renewed to which Glucophage was added.

7.    In September 2012 the Plaintiff began seeing Dr. Saleh, and Dr. Saleh became her primary care physician. At that first appointment the Plaintiff complained of depression and anxiety (albeit stable and well-controlled with medication), pre-diabetes (for which she takes medication), high cholesterol, elevated liver factors, joint pain, weight gain, low energy, and excessive fatigue. Dr. Saleh refilled her prescriptions. Except for the two appointments at the West Volusia Family medical practice in July 2012 and the visit to Dr. Saleh in September 2012 there is a gap in medical treatment after her move to Florida through March 2013.

8.    She returned to Dr. Saleh in March 2013 with a variety of complaints: headaches (for which Topamax was prescribed), swollen joints in her hands, depression and anxiety (which she manages successfully with Zoloft), and high cholesterol. Her prescriptions were refilled. This included hormone replacement medication which she elected to continue despite its side-effects. She reported that she had stopped taking diabetes-related medication. The Plaintiff had elevated liver factors and testing revealed a fatty liver. The Plaintiff was given a statin

medication and advised to diet and exercise for improved liver
health.

9.    Testing also suggested rheumatologic factors, and in
April 2013 she began treatment with the rheumatologist, Dr.
Vintimilla. The Plaintiff reported body aches and a six year
history of arthralgias. She said that occasionally her skin is
too sensitive to touch and that she occasionally falls. The
Plaintiff reported that her pain medications provide only
partial relief. Upon physical examination Dr. Vintimilla
observed swelling and tenderness in some of the joints in her
hands as well as tenderness in other joints. Dr. Vintimilla also
observed some spasms in her lumbar spine. She retained full
ranges of motion however. An x-ray of her hands was normal. Dr.
Vintimilla noted the absence of any physical disability. Dr.
Vintimilla diagnosed joint arthralgias; myalgia and myositis;
and long-term medication use. Dr. Vintimilla advised her to take
ibuprofen as needed for pain relief.

10.    Shortly after that appointment the Plaintiff applied
for disability benefits. She claimed disability due to a very
wide range of conditions and ailments which in turn cause a
pronounced degree of impairment. Of them the primary source of
disability was pain and the secondary source was depression and
anxiety. On May 21st Dr. Saleh told the Commissioner that the

6 of 26

Plaintiff has no severe mental health condition. Because medications control her depression, she has not been referred to formal mental health treatment. Later in August 2015 Dr. Saleh diagnosed the Plaintiff with a Dysthymic Disorder and described that condition as stable and improved with Zoloft.

11.    In May 2013 Dr. Vintimilla diagnosed rheumatoid arthritis and osteoarthritis for which she prescribed arthritis-related medications. The Plaintiff saw Dr. Vintimilla on a regular basis thereafter for monitoring of her arthritis. At those follow-up appointments the Plaintiff complained of various aches and pains. (The ALJ notes the assessment of "noncompliance with medical treatment" that Dr. Vintimilla made in June 2014, but that treatment note does not specify the form of that non-compliance.)

12.    The Plaintiff also continued seeing Dr. Saleh. As with Dr. Hultman earlier, Dr. Saleh treated the Plaintiff for a wide variety of complaints that changed in focus over time. The Plaintiff continued to complain of depression and anxiety from life stressors, for example, and Dr. Saleh continued to describe her mental health condition as stable. She continued to complaint of poor sleep. A sleep study was performed in March 2014 that revealed relatively non-severe sleep apnea which CPAP use fully resolved. Subsequent treatment notes consistently

describe the Plaintiff's sleep apnea condition was stable and well-controlled with CPAP use.

13.  As early as August 2013, the Plaintiff had been complaining of urinary symptoms and starting in November 2013, of kidney stone-related symptoms. In early 2014 the Plaintiff began seeing a urologist, Dr. Tirney, for that condition. At different times in 2014 and in 2015 the Plaintiff saw Dr. Tirney (or his colleagues at the same practice) for different bouts of kidney stones. Each of those bouts soon resolved.

14.  The Plaintiff continued to complain of GERD and gastric discomfort, and treatment continued to be through medication management. In February 2015 the Plaintiff saw a gastroenterologist, Dr. Gupta, complaining of severe gastric symptoms (no corroborated by the rest of the medical record). An endoscopy showed an overall normal condition. Dr. Gupta recommended very conservative treatment measures to control the condition.

15.  At various times over the preceding medical history the Plaintiff had complained of a sore low back. When she had begun seeing Dr. Vintimilla, arthritis was considered to be the cause. She complained of low back pain again in February 2014. At that time the cause was attributed to kidney stones and to ongoing constipation; radiographs of her lumbar spine were

relatively unremarkable. At her July 2015 appointment with Dr. Saleh, she complained of low back pain. The physical examination was overall normal except for paraspinal tenderness and pain during motion range testing. Dr. Saleh attributed the back pain to arthritis or muscle soreness. Dr. Saleh noted that the Plaintiff already was taking the appropriate medications. Dr. Saleh planned to send her to physical therapy if the pain persisted. At the appointment on October 6th the Plaintiff reported to Dr. Saleh increasing low back pain and the first complaint of hip pain. The physical examination remained the same, with observations of paraspinal tenderness and pain with motion but otherwise normal. Dr. Saleh diagnosed sacral back pain.

16.    At times over the treatment history the Plaintiff complained of hand numbness. She did so again in February 2015 at an appointment with Dr. Vintimilla and again in August 2015 at an appointment with Dr. Saleh. Nerve testing was undertaken later in August 2015, and it yielded normal results.

17.    On August 25, 2015 an MRI was taken of the Plaintiff's cervical spine. It showed narrowing at the C3—4 and C4—5 discs and moderate spondylosis (but with no evidence of herniation or stenosis). With no other objectively determinable cause for the hand numbness complaint available, Dr. Saleh attributed the hand

discomfort to cervical radiculopathy. This Court notes that it was at the September 2nd appointment with Dr. Saleh---and thus after the cervical MRI was taken on August 25th---when the Plaintiff raised her first complaint of neck pain and when the first observation of a reduced range of neck motion was observed.

18.    The Plaintiff testified at the administrative hearing held October 16, 2015. She was 57 years old at the time. She alleged disability due to a wide variety of ailments: rheumatoid arthritis, fibromyalgia, migraines, depression and anxiety, GERD, low back and hip pain, and neck pain. She alleged hand pain that precludes keyboard use. She alleged poor nighttime sleep and excessive daytime napping. She explained that her medications make her sleep heavy, and that fatigue substantially reduces her activity level. She complained of poor balance and poor short-term memory. As far as daily life activities, she said that she stays mostly at home. The exception are trips to the grocery store and to check her mail; church on Monday nights; and visits with her neighbor. She has not traveled out of state to visit family for the past two years. Although a Vocational Expert ("VE") also appeared at the hearing, the ALJ continued the hearing to a later date to give more time to take vocational testimony. By the time the hearing had progressed to

take the VE's testimony, the time that the ALJ had allotted for the whole hearing had run out, and the ALJ needed to begin the next scheduled hearing.

19. Subsequent treatment notes show greater focus on orthopedic-type pain complaints. The Plaintiff began complaining of more pronounced complaints of low back pain, sciatica, and related hip pain as well as neck pain with related hand radiculopathy. Dr. Saleh prescribed Tylenol with codeine. The Plaintiff also complained of worsening joint pain for which Dr. Vintimilla switched her arthritis medication from Humira to Xeljanz.

20. On November 4, 2015 the Plaintiff went to Heartland Rehabilitation Services for a test of her functional abilities, presumably on the referral of Dr. Vintimilla. Chris Conn, a physical therapist there, conducted that test, and he reported his findings in a residual functional capacity questionnaire (at pages 756—57 of the Administrative Record). Mr. Conn opined that the Plaintiff can engage in each of the activities of standing, sitting, walking, and driving for one to three hours in a day. He opined that the Plaintiff can lift no more than 10 lbs., limiting her to lifting small objects on an occasional basis consistent with sedentary work. He said that the Plaintiff's headaches preclude her from performing repetitive pushing and

pulling. Mr. Conn opined that the Plaintiff can engage in postural activities on an occasional basis except for bending which the Plaintiff can do frequently and climbing more than 13 steps which she cannot do. He noted that the Plaintiff drove 40 minutes to the testing center. He noted grip strength of 10 lbs. in the right hand and 6 lbs. in the left, and he noted a pinch strength of 5 lbs. in both hands. Mr. Conn based his RFC ratings on the Plaintiff's performance and subjective reports of pain. He noted that the Plaintiff complained of pain "before, during and after testing."

21. The Plaintiff saw Dr. Saleh on December 17th. At that appointment Dr. Saleh diagnosed osteoarthritis and rheumatoid arthritis without specific site locations. On that same day Dr. Saleh also filled out an RFC questionnaire (that begins at page 759 of the Administrative Record) which in his accompanying treatment note (at page 907 of the Administrative Record) he explained he did "after reviewing functionality evaluation, rheumatology note" presumably in reference to Mr. Conn's questionnaire.

22. In his RFC questionnaire Dr. Saleh noted a wide range of symptoms and pain complaints as well as a wide range of aggravating factors (weather, cold temperatures, fatigue, both movement and staying still, and stress). Dr. Saleh opined that

the Plaintiff can sit or stand up to three hours at a time (but each for a total of just two hours in a day). Moreover to sit she must elevate her legs, and she must be able to shift positions at will. She can walk less than one block's distance at a time, but she also must be able to get up and walk around every 30 minutes for ten to fifteen minute breaks. She can lift less than 10 lbs. She can stoop or bend frequently and crouch occasionally, but she cannot climb ladders or stairs. She rarely can hold her neck in sustained flexion. Her hands go numb even from simple tasks. She is incapable of even low stress jobs "according to the patient", Dr. Saleh states. Her pain is so severe that it frequently would hinder attention and concentration in the workplace. She would miss more than four days of work a month.

23. Dr. Saleh sent the Plaintiff to Brooks Rehabilitation for physical therapy for treatment of her low back pain. Physical therapy began on November 17th. The Plaintiff complained of widespread arthritic pain, neck pain, and low back pain that radiates down into her left hip. She attributed the neck pain to a car accident from her youth for which she has taken pain medication ever since. Upon physical examination the Plaintiff was overall very weak, with reduced range of motion and nerve sensation and positive for pain behaviors. This Court

notes that this physical examination report is the most pronounced of record.

24.   On Dr. Saleh's referral, the Plaintiff saw an orthopedist, Dr. Lavoie, for her low back pain. The physical examination at the first appointment on November 19th was normal. The physical examination at the second appointment on December 14th showed just mild lumbar discomfort and spasms. An MRI was taken of the Plaintiff's lumbar spine on December 16th. It showed anterolisthesis of the L4—5 disc without significant canal stenosis but with moderate to severe narrowing on the left side. Dr. Lavoie interpreted the MRI as showing mild stenosis at the L4—5 disc and a bulge at the L5-S1 disc with some nerve impingement. On January 14, 2016 the Plaintiff reported to Dr. Lavoie that physical therapy and medication had not relieved her low back pain. The physical examination was overall unremarkable except for the description of the Plaintiff has being in mild distress and the observation of lumbar tenderness. Dr. Lavoie did not consider the Plaintiff to be a candidate for surgery; he attributed both her neck and low back pain complaints to osteoarthritis. Dr. Lavoie recommended pain management instead.

25.   On January 15, 2016 the Plaintiff went to physical therapy. It was the thirteenth session. The physical therapist noted meaningful improvement. He further noted that the

Plaintiff still had not undertaken aquatherapy despite its anticipated benefits for her particular condition. (At the hearing she explained that she did the aquatherapy in her own private pool.)

26. On January 20, 2016 the Plaintiff began pain management with Dr. Khromov. She complained of neck pain (that she attributed to the car accident from her youth), low back pain (which she said had started in February 2015), and hand numbness. (Of note she did not mention arthritis.) She said she no longer could walk for exercise, and she described herself as "somewhat depressed" over her reduced functional ability. She described herself as a retired teacher. Upon physical examination Dr. Khromov observed a reduced range of lumbar motion, lumbar tenderness, and a positive straight leg raise test. He also observed a minimal amount of pain in her gait. The examination of her neck and extremities was normal. Dr. Khromov diagnosed lumbar disc degeneration, sacroiliac joint pain, lumbar spondylosis, cervical disc degeneration, and psychogenic backache. He increased her Neurontin dosage, prescribed Tramadol, and prescribed physical therapy. He adjusted the pain medication prescriptions after the Plaintiff complained of sedation and dizziness at the March appointment. Dr. Khromov

also administered a series of pain-relieving spinal injections over the next several months.

27. The Plaintiff saw Dr. Vintimilla on February 15, 2016. She reported that the newly prescribed Xeljanz medication was helping. She reported further ongoing relief at the next appointment that May.

28. The Plaintiff saw Dr. Saleh twice in May 2016. Dr. Saleh noted how many of her conditions (dysthymic disorder, GERD, and sleep apnea) remain stable. Her cholesterol had increased again, but that was from her diet. She complained of back pain and paraspinal "twitches" during keyboard use. She complained of hand numbness with the onset of the new symptom of jerking. The Plaintiff complained of low back pain and sciatica (but not of neck pain). Dr. Saleh adjusted the Plaintiff's prescriptions to account for those that DR. Khromov was prescribing.

29. The Plaintiff's medication regimen in May 2016 was largely the same as it was at the start of the treatment history. The Plaintiff continued to take Zoloft, pain medications (muscle relaxers, Ultram, and Tramadol), as well as medications for arthritis, hormone replacement, and management of a variety of additional conditions. To this the Plaintiff now

was taking such additional medications as Neurontin and Tylenol with codeine.

30. The Plaintiff continued to go to physical therapy. The physical therapist observed how on one hand the Plaintiff is making good progress but on the other hand experiences re-exacerbation events. On June 15th, for example, the Plaintiff reported increased low back pain after packing to move. On June 29th she complained of left knee pain.

31. The Plaintiff returned to her urologist on June 16th. She no longer had any kidney stone-based complaints. She had had a few bouts of urinary tract infections, but all of them responded successfully to anti-biotics. Instead she reported the new onset of overactive bladder. The urologist recommended diet modification and a trial of Vesicare medication.

32. The Plaintiff testified at the continued hearing date held on July 1, 2016. The Plaintiff again reported a wide range of medical ailments that she alleged were disabling. Those conditions since had worsened in severity, she added. She alleged worsening rheumatoid arthritis that now had spread to her hips, ankles, and feet. She alleged worsening pain and numbness that greatly impaired the use of her upper extremities. She complained of left knee and ankle swelling; severe neck pain with secondary stiffness, muscle spasms, headaches, and eye

strain; severe low back pain with radiation down into her hips and left leg; obstructive sleep apnea; overactive bladder that hinders sleep; a recent abnormal mammogram; fibromyalgia; and extreme exhaustion. She had no more migraines however (although still frequent headaches). She had become less depressed, too (although she felt her depression now may be returning).

33.  She described a very pronounced degree of impairment resulting from them. She can lift no more than 5 lbs., and she can stand only for a very brief time. It takes her until noon before she can get fully dressed and ready for the day. She relies on her roommate to drive her around and to do all of her household chores.

34.  At Step Two of the disability analysis the ALJ found the Plaintiff to have the "severe impairments" of rheumatoid arthritis, osteoarthritis, and disorders of the spine. The ALJ found none of the Plaintiff's other claimed or diagnosed medical conditions to meet the definition of a "severe impairment" for Step Two purposes. Nor did the ALJ find the Plaintiff to be fully disabled. The ALJ found the Plaintiff still capable of performing light exertion work to which the ALJ added the two additional restrictions of no concentrated exposure to extreme cold and the avoidance of even moderate exposure to pulmonary irritants. Citing the testimony of the VE from the second

hearing, the ALJ found the Plaintiff capable of returning to her past work as either a Preschool Teacher or School Evaluator. The ALJ concluded that the Plaintiff therefore is not disabled.

## DISCUSSION

35. Judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence and whether the proper legal standards were applied. See Lewis v. Callahan, 125 F.3d 1436 (11th Cir. 1997). Supporting evidence need not be preponderant to be substantial so long as it amounts to more than a scintilla; in other words, it is such relevant evidence that a reasonable person might accept as sufficient and adequate to support the conclusion reached. See id. at 1440. If the decision is supported by substantial competent evidence from the record as a whole, a court will not disturb that decision. Neither may a court re-weigh the evidence nor substitute its judgment for that of the ALJ. See Wolfe v. Chater, 86 F.3d 1072 (11th Cir. 1996). See also, Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). While the Commissioner's factual findings enjoy such deference, a court is free to review the Commissioner's legal analysis and conclusions de novo. See Ingram v. Comm'r, 496 F.3d 1253, 1260 (11th Cir. 2007). See generally, Jordan v. Comm'r, 470 Fed.Appx. 766, 767-68 (11th Cir. 2012).

36.    The Plaintiff argues that the ALJ erred in discounting the RFC questionnaire that Dr. Saleh had filled out. The Plaintiff had an established treating relationship with Dr. Saleh, and consequently the ALJ should have given his questionnaire greater, or indeed controlling, weight, the Plaintiff argues. In both her summary judgment motion and hearing argument the Plaintiff provides a very thorough discussion of the standard for considering the medical opinions of a treating source. The governing regulation is 20 C.F.R. § 404.1527, and the case of Hargress v. Comm'r, 883 F.3d 1302, 1305—06 (11th Cir. 2018) provides a recent application of it and the related case law. This Court applies that governing standard here. This Court clarifies that the alleged error is not that the ALJ overlooked or failed to take into consideration a medical opinion statement (from any source, be it treating, examining, or non-examining). The issue before this Court instead is whether the ALJ stated a sufficient basis for giving the weight that he did to the respective medical opinion statements of record and whether competent, substantial evidence supports the ALJ's determination.

37.    The Plaintiff makes a thorough argument for how she does have diagnoses for medical conditions that could cause pain, has instances of pain-related impairments noted in the

treatment records, and a treatment history therefor leading up to December 17, 2015 when Dr. Saleh filled out his RFC questionnaire. In the same way the ALJ discusses that same treatment history but highlights those aspects from it that directly contradicts or fails to corroborate the impairments that Dr. Saleh describes in his questionnaire. Having conducted its own independent review, this Court finds the ALJ's analysis compliant with the governing standards and adequately supported by the evidence to survive judicial review. Although the Plaintiff provides thorough argument, in the end analysis this Court sees no error that warrants remand.

38. It is true that the Plaintiff sought treatment for pain complaints and that diagnoses were made of conditions that can cause pain. The dispositive point here is that nothing of the treating record leading up to the questionnaire (or indeed afterwards) corroborates the presence of such a wide range of pronounced impairments that Dr. Saleh describes therein.

39. Dr. Hultman's treatment notes precede the Plaintiff's date last worked of September 15, 2011, and they show pre-existing pain complaints. However those pain complaints were not especially pronounced in their own right and not the focus of treatment either. The Plaintiff does allege that pain limited her ability to work to some degree, but she adds that she also

was given accommodations for those impairments. In any event the record suggests that job stress---and not a specific pain condition---was the primary cause for work cessation. The record also suggests that her work cessation was a form of retirement. Likewise pain complaints and conditions remained a part of, but not the consistent focus of, medical treatment after her move to Florida. Her rheumatologist, Dr. Vintimilla, observed some joints in her fingers to exhibit swelling or discomfort, but physical examinations also showed areas of normal hand and finger functioning. Even if Dr. Vintimilla's observation of "no physical disability" is a finding reserved for the ALJ to make, the fact remains that Dr. Vintimilla's treatment notes suggest no physical pain condition of disabling severity. Treatment remained overall conservative consisting of medication management as well as repeat advice for better diet, exercise, and weight loss. Indeed it was Dr. Hultman's hope that Florida's warmer weather would allow her to exercise more so that she could rely on medications less.

40. Neither the medical record on the whole or Dr. Saleh's own treatment notes, specifically, support the degree of impairment that Dr. Saleh describes in his questionnaire. The record suggests that Dr. Saleh relied instead on the Plaintiff's own subjective reports. The same defect remains to the extent

Dr. Saleh relied on Mr. Conn's RFC report. This is because Mr. Conn relied on the Plaintiff's subjective reports, too.

41. Arthritis (and also kidney stones), rather than orthopedic spine defects, was the focus of pain treatment in the months leading up to those two questionnaires. Soon after those questionnaires the Plaintiff began to experience significant arthritic pain relief with Xeljanz medication. Around the time of Mr. Conn's and Dr. Saleh's questionnaires the Plaintiff began treatment for orthopedic pain complaints concerning her lumbar and cervical spine. It is unknown whether at that time either Mr. Conn or Dr. Saleh was aware of the orthopedic treatment yet, but in any event it makes no material difference. The orthopedist, Dr. Lavoie, saw no spine defect of such severity to warrant surgical intervention. Dr. Lavoie instead recommended (ongoing) conservative treatment measures such as physical therapy.

42. The ALJ provides a thorough review of the evidence, and she discusses in depth the various opinion statements of record. The ALJ emphasizes those same points that this Court summarizes above. This Court sees no shortcoming in the ALJ's analysis that warrants a remand.

43. The Plaintiff next argues that the ALJ erred by giving greater weight to the non-examining medical advisor than she

gave to Dr. Saleh. This objection refers to the RFC rating that Dr. Molis authored on September 3, 2013 and is found in the Administrative Record at Exhibit 3A. This Court sees no error in how the ALJ factored that advisory RFC rating into the analysis. For one this Court does not see that the ALJ impermissibly used the RFC advisor report as the basis by which to discount Dr. Saleh's questionnaire. Instead the ALJ states good cause for discounting it independently. That left the ALJ free to consider and weigh the non-examining advisor's RFC rating in its own right. After doing so the ALJ explained why the advisory RFC rating more accurately reflects the Plaintiff's functional abilities than the questionnaires do.

44. The Plaintiff claims disability based on a wide variety of ailments that she alleges cause a very pronounced degree of impairment. The Plaintiff proffers medical records from several different treating sources that spans from April 2010 to June 2016. It was for the ALJ as fact-finder to reconcile the Plaintiff's disability allegations against that evidentiary record and to assess therefrom what the Plaintiff's functional ability is. The ALJ's analysis led her to assess an RFC for light work.

45. This Court sees no error in how the ALJ conducted that analysis. The ALJ took the whole evidentiary record into

consideration and did not ignore or overlook any material part of it. The ALJ considered "the intensity, persistence, or functionally limiting effects of pain or other symptoms" that the Plaintiff alleges. The ALJ also considered the medical opinions of record in conformity with 20 C.F.R. § 404.1527. The questionnaires of Mr. Conn and Dr. Saleh were the two items of evidence of the greatest degree of impairment. As an established treating source, it is true, as the Plaintiff correctly emphasizes, that Social Security law generally gives Dr. Saleh's opinion statement great weight. That does not mean that treating source opinion alone is controlling. Social Security law permits the ALJ to discount the medical opinion from a treating source if there is good cause to do so. See Hargress, supra. The ALJ states good cause here, explaining how the very pronounced degree of impairment that Dr. Saleh describes in his questionnaire lacks corroboration.

### CONCLUSION

46. It is not for this Court upon judicial review to re-weigh the evidence or reach findings of fact anew; such is the responsibility of the ALJ as the fact-finder in this case. In other words Social Security law does not permit this Court to make its own decision about the Plaintiff's disability application. Social Security law instead limits the scope of

consideration to reviewing the ALJ's decision on appeal. This Court's review is limited to ensuring that the ALJ's findings of fact are supported by competent, substantial evidence and that the decision comports with the governing law and regulations. Social Security law thereby requires a certain degree of deference to the ALJ's decision. Having reviewed the parties' arguments and having independently and carefully reviewed the whole record, this Court finds the decision to have such support, with no grounds warranting reversal or remand.

It is therefore,

**ORDERED AND ADJUDGED** that the Plaintiff's Motion for Summary Judgment (DE 12) is **DENIED**. Seeing no grounds warranting reversal or remand, this Court **AFFIRMS** the Commissioner's decision.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this ⎧⎧ᵗʰ day of September, 2018.

SHANIEK M. MAYNARD
UNITED STATES MAGISTRATE JUDGE